IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

FAYE GROOM,
BETH ANN LEVY,
JENNIFER PRANCE
ANDREA WHITE

      Plaintiffs,

v.                                         CASE NO.  1:04cv408-RH

FRESENIUS MEDICAL CARE
NORTH AMERICA INC.,

      Defendant.

_____/

## ORDER DENYING MOTION FOR NEW TRIAL

      The jury returned a verdict for the defendant in this sexual harassment case. The plaintiffs have moved for a new trial based on the defense opening statement and closing argument.  I deny the motion.

I

      The defendant Fresenius Medical Care North America Inc. operates a renal dialysis facility in Gainesville, Florida.  The plaintiffs Faye Groom, Jennifer Prance, and Andrea White were patient care technicians who worked at the facility.

The other plaintiff, Beth Ann Levy, was a patient who received dialysis there.

The plaintiffs allege that another patient care technician, Edward Van Rhodes, sexually harassed them, including by groping them and making sexually inappropriate comments and gestures.  The plaintiffs assert that Fresenius negligently hired, retained, and supervised Mr. Rhodes and that Fresenius thus is liable under Florida common law for Mr. Rhodes's commission of the torts of battery and assault.  The three employee-plaintiffs assert they were subjected to a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended, and that Fresenius is responsible for the environment because it knew or should have known of its existence.  Fresenius denies these allegations and asserts an affirmative defense to the hostile work environment claim based on *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998).

After a full and fair trial, the properly instructed jury returned a verdict finding that Mr. Rhodes did not batter or assault Ms. Groom or Ms. Levy and did not subject Ms. Groom to a hostile work environment.  In effect, the jury did not believe Ms. Levy's and Ms. Groom's claims.  The jury also found, however, that Mr. Rhodes *did* batter or assault Ms. Prance and Ms. White and *did* subject them to a hostile work environment.  In effect, the jury believed their claims.  But the jury

also found that Fresenius was not responsible for the mistreatment of Ms. Prance and Ms. White. Based on the instructions, the finding that Fresenius was not responsible encompassed three subsidiary findings. First, the mistreatment of Ms. Prance and Ms. White did not result from negligent hiring, retention, or supervision of Mr. Rhodes. Second, the hostile work environment did not continue after it was reported to any person with authority to take corrective action. And third, the hostile work environment did not continue after anyone who supervised Mr. Rhodes, Ms. Prance, or Ms. White knew or should have known of the hostile environment's existence. There were no relevant objections to the jury instructions; both sides agreed they properly set forth the governing law.

All four plaintiffs now seek a new trial based on the defense opening statement and closing argument. There were no relevant objections to the opening statement, only two relevant objections to the closing argument, and no relevant request for a mistrial.

II

Before turning to the opening statement and closing argument, a word is in order about the weight of the evidence and the verdict. The bottom line is this: the verdict was imminently reasonable.

Mr. Rhodes applied for a job with Fresenius in April 2002. His application said he had three years of phlebotomy experience. The application listed his most

recent employer as Life South, a blood bank, and his preceding employer as Shands AGH, a hospital.  Mr. Rhodes submitted a glowing reference letter from his immediate supervisor at Life South.  (Def. ex. 47.)  Mr. Rhodes listed his reason for leaving that job as "dispute with tech."  (Def. ex. 45 at 2.)  He listed the reason for leaving Shands AGH as "position phased out."  (*Id*.)

Fresenius sent standard forms to both Life South and Shands AGH asking for information including the reasons for Mr. Rhodes's departure and whether he was eligible for rehire.  Life South confirmed Mr. Rhodes's dates of employment and position but refused to provide further information.  The form's "reason for leaving" line, however, had a scratched-out response that, with a close look, one could determine had said "laid off."  (Def. ex. 52.)  Shands AGH confirmed Mr. Rhodes's dates of employment and position and listed his reason for leaving as "position closed."  (Def. ex. 51.)  Shands AGH stamped the form, "hospital policy does not permit the release of additional information."  (*Id*., capitalization omitted.)

Fresenius thus had confirmed that Mr. Rhodes had worked for the employers he claimed in the positions he claimed during the times he claimed.  And Fresenius had a glowing reference letter from Mr. Rhodes's immediate supervisor at Life South.  On the negative side, Mr. Rhodes had said he left Life South because of a dispute with a technician, and Fresenius perhaps could have deduced— from that statement and from Life South's scratched-out statement that he had been laid

off—that in fact Mr. Rhodes had been fired. The information available to Fresenius about Mr. Rhodes's reason for leaving Shands AGH—both from Mr. Rhodes's application and from the form sent to Shands AGH—was that Mr. Rhodes's position had been eliminated.

Fresenius hired Mr. Rhodes. Ms. Groom says that during an orientation session being conducted by the director of nursing, Mr. Rhodes volunteered that he had agreed to leave his former employer (Life South) because he had engaged in sexual harassment, and that the director of nursing responded that she was aware of this and that it had best not happen at Fresenius. This seems more than a little unlikely. The record suggests no reason why, as a new employee, Mr. Rhodes would volunteer this information, and the record includes no support for the assertion that the director of nursing knew or had any way of knowing about any sexual harassment by Mr. Rhodes at Life South.

In any event, Mr. Rhodes went to work at Fresenius. He was a skilled patient care technician. Because of this, Ms. Levy often asked that he perform the technician services she needed. She even wrote a letter supporting his attempt to get a raise. Mr. Rhodes also apparently got along well, at least for some period, with Ms. Groom, Ms. Prance, and Ms. White. If any report of inappropriate comments or gestures or improper touching by Mr. Rhodes went up the chain of command, this record includes no evidence of it, other than the plaintiffs' own

after-the-fact testimony.

This changed on July 28, 2003. On that date another patient care technician, Mirta Euralia Somoana, reported to the clinic manager, JoAnn Mancini, that Mr. Rhodes had touched her inappropriately. Ms. Somoana asked Ms. Mancini not to confront Mr. Rhodes or take other action. Ms. Mancini complied with the request in part. She did not confront Mr. Rhodes or take action against him. Ms. Mancini did, however, conduct a staff meeting that very day, advising all employees, including Mr. Rhodes, that there were to be no sexually oriented comments and no touching. The employees were required to sign an acknowledgment of their attendance at the meeting. Ms. Mancini asked Ms. Somoana whether she was satisfied with this treatment of the matter, and Ms. Somoana said she was.

Two weeks later, on August 11, 2003, Ms. Somoana returned to Ms. Mancini and withdrew her request that no action be taken against Mr. Rhodes. Ms. Somoana said she could not work with Mr. Rhodes. Ms. Mancini immediately reported the situation to her superior, James Harrell, who was the highest ranking Fresenius employee on site. On August 18, 2003, Mr. Harrell alerted the division human resources director. Mr. Rhodes was immediately suspended without pay. He was later fired. He never worked with Ms. Somoana after her August 11 request not to work with him, and he never worked at Fresenius at all after August

18, 2003.[1]

The facts as recounted above were well established at trial. There was a substantial dispute in the evidence, however, with respect to the remaining facts—what Mr. Rhodes did or did not do to the plaintiffs, whether they told supervisors about it, and whether any misconduct was so pervasive that supervisors knew or should have know about it, even aside from any report. The plaintiffs testified they were subjected to constant inappropriate comments and gestures over a long period. And each plaintiff said Mr. Rhodes touched her inappropriately at least once. Finally, the plaintiffs said they reported this to supervisors—including nurses—who did nothing.

Much of the plaintiffs' testimony did not ring true. The dialysis treatment room was an open area with perhaps eight treatment stations. Seats were in demand; they did not sit idle for significant periods. Several technicians and at least one nurse usually were present, in addition to the patients. It seems implausible that the nurses—including some with long experience and little to fear from subordinate technicians—would tolerate open misconduct of the kind the plaintiffs allege. And it seems equally implausible that this many patients would uniformly tolerate this kind of misconduct in a treatment facility. In argument, the

---

[1] Ms. Somoana originally joined this lawsuit as a plaintiff. Fresenius settled with her prior to trial. Her claims thus are not at issue.

*Case No: 1:04cv408*

plaintiffs suggested that many of the patients were old and thus reluctant to speak out, but common experience suggests that with advancing age some people become more outspoken, not less.  The notion that so many patients would suffer this type of behavior in silence defies credulity.

Ms. Levy testified that on one occasion Mr. Rhodes crudely and obviously rubbed his genitals on her immobilized arm while she was undergoing dialysis, that he repeatedly and unnecessarily brushed against her breasts while adjusting her tubing, and that on several occasions she loudly complained of his actions, to no avail.  This occurred, she said, in the open dialysis treatment room, in full view of others.  But Ms. Levy could not even remember the location of the nurse's station in that room.  She attributed this to having been in many treatment rooms over the years.  The only sexual abuse, however, allegedly occurred in *this* room, and her only loud complaints of abuse allegedly occurred in *this* room.  If indeed these things occurred, one might have expected her to remember the layout of the room, including the relative location of her chair and the nursing station from which she got no help.  More importantly, it would be an uncommonly brazen sexual harasser who would grossly rub his genitals on a helpless patient in full view of numerous others, and a remarkably unprofessional nurse who would allow a technician—a subordinate—to engage in such conduct.  The jury reasonably found that the alleged mistreatment did not occur.

Ms. Groom testified that Mr. Rhodes made crude gestures every time he made eye contact with her.  This occurred with great frequency, she said, including in the open treatment room in full sight of others.  Ms. Groom also said that Mr. Rhodes groped her in a back room on July 30, 2003.  That was two days after Ms. Somoana's report to Ms. Mancini and one day after Ms. Groom filed a bankruptcy petition.  Thus the battery was timed perfectly for purposes of this lawsuit:  after the first verifiable notice to Fresenius of Mr. Rhodes's misconduct, and on the very first day when Ms. Groom (rather than the bankruptcy estate) would be entitled to any recovery.  The jury reasonably found that the alleged battery did not occur.

Ms. Prance and Ms. White testified more credibly that they were touched inappropriately. Fresenius argued at trial that Mr. Rhodes never did anything improper to anybody, but Fresenius plainly did not believe that itself, at least at the time of the events.  To the contrary, Fresenius fired Mr. Rhodes promptly after hearing from Ms. Somoana and others.  The jury reasonably found that Ms. Prance and Ms. White were battered.

The jury also found, however, that Mr. Rhodes's mistreatment of Ms. Pratt and Ms. White occurred only prior to the time when Mr. Rhodes's misconduct was first reported to Fresenius, and prior to the time when a supervisor first knew or should have known of the problem.  This finding, too, made sense.  When it hired Mr. Rhodes, Fresenius had some indication that he had been fired from his last job

over a dispute with a co-worker, but Fresenius had a glowing letter of recommendation from his immediate supervisor and no reason to believe he had engaged in sexual harassment. He was technically proficient, performing his job well. Though the plaintiffs said his misconduct was open and obvious and that they reported it to the nursing staff, this made no sense. A reasonable jury could have found that Fresenius supervisors did not know, and should not have known, of Mr. Rhodes's misconduct until July 28, 2003, when Ms. Somoana made her report to Ms. Mancini. And a reasonable jury could have found that Ms. Prance and Ms. White suffered no battery, assault, or hostile work environment after that date.

In sum, the verdict comports in all respects with the manifest weight of the evidence.

III

The opening statements and closing arguments were hardly a model on either side. The openings were unduly argumentative, but neither side objected. The closings were often conclusory and sometimes intemperate. Neither side presented a calm and thoughtful analysis of the evidence (as presented during the trial) and the law (as set forth in the jury instructions). Such an analysis might have helped the jury do its job. Instead, the jury was left to sort it out largely for itself.

There is every reason to believe the jury did precisely that. As is typical in Gainesville, it was a strong jury. The 12 jurors sat through the testimony, often taking notes, and had the exhibits. I sent 12 copies of the (admittedly correct) instructions into the jury room. The jury deliberated for most of two days. The verdict was not a knee jerk reaction to either side's arguments. Instead, it was a thoughtful resolution of the disputed issues.

In their new-trial motion, the plaintiffs quote the defense opening and closing at length, but they made contemporaneous objections to only two comments, both from the closing.

First, the defendant's attorney said, "All of the evidence that's before you proves nothing in terms of the plaintiffs' claims, nothing except that they are willing to do anything for money." (Defense closing argument as quoted in Plaintiff's Motion for New Trial (document 278) at 10.) The plaintiff's attorney objected, and I overruled the objection. The comment was intemperate, but so was the plaintiffs' argument; in tone, this was a fair response to the plaintiffs' argument. In substance, this was simply an argument that the plaintiffs' testimony was motivated by money and was not credible. Whether a witness has an interest in the outcome of the case is of course a factor properly considered by a jury in deciding whether to believe the testimony. Indeed, the jury instructions explicitly told the jury this. The plaintiffs did not object to that instruction, nor could they

*Page 12 of 15*

reasonably have done so.

Second, the plaintiffs objected when the defense attorney referred to Keith Benson, one of the plaintiffs' witnesses, as "a man who stalks little girls." I overruled the objection. The reason requires some explanation. Mr. Benson had been a Fresenius employee, but he was fired when he was arrested for stalking minor girls. He later entered a plea of nolo contendere to that charge. Impeachment of a witness on the ground of bias—for example, that he was fired by the party against whom he is testifying—is proper. I ruled prior to trial that Fresenius could cross-examine Mr. Benson about the fact that he was fired (though not necessarily about the ground for the firing). I ruled that Fresenius could not prove the stalking charge under Federal Rule of Evidence 609, because adjudication of guilt was withheld and thus, under the law of the circuit, he was not convicted. *See United States v. Georgalis*, 631 F.2d 1199, 1202 (5th Cir.1980).[2] I made no further definitive pretrial rulings on the permissible scope of cross-examination of Mr. Benson.

---

[2] In reaching this conclusion, *Georgalis* relied on Florida law, that is, the law of the jurisdiction where the underlying charge was prosecuted. Another panel recently followed *Georgalis* and again cited Florida law. *See United States v. Svete*, 521 F.3d 1302, 1313 n.12 (11th Cir.), *vacated for rehearing en banc on other grounds*, --- F.3d ----, 2008 WL 2595873 (11th Cir. July 1, 2008). Though this is plainly the law of the circuit, there is a strong argument that it should not be. Rule 609 is a *federal* rule, and there is much to be said for the view that the meaning of the term "convicted" in Rule 609 is a question of *federal* law.

The plaintiffs' attorney rendered all of this moot by his direct examination of Mr. Benson. The plaintiffs' attorney asked Mr. Benson whether he was fired and why. Mr. Benson said he was fired while on vacation, by letter, not in person, based on his stalking arrest. He said he took a plea, that adjudication of guilt was withheld, and that he expected to have the record expunged.[3] Turning to the merits, the plaintiffs' attorney asked Mr. Benson not just what he saw Mr. Rhodes do or what he heard Mr. Rhodes say. The plaintiffs' attorney also asked Mr. Benson his opinion about whether Mr. Rhodes's behavior was improper. Mr. Benson opined that the behavior was improper. The plaintiffs' attorney then asked Mr. Benson the basis of his opinion, and Mr. Benson said his Marine Corps training and "morals." Based on this direct testimony, I allowed the defense to cross-examine Mr. Benson not just about the fact that he was fired, but also about the stalking charge. Having elicited Mr. Benson's version of the stalking charge and a suggestion the charge was unfounded, having elicited a veiled suggestion that the firing was improper, having elicited Mr. Benson's opinions about sexual misconduct, and having supported the opinions by touting Mr. Benson's Marine Corps experience and "morals," the plaintiffs had no grounds for complaint when,

---

[3] In fact, Florida law does not allow expungement of a record of an offense of this nature. The jury did not learn this, however. To the extent the prospect of expungement mattered at all, it mattered only as an explanation of Mr. Benson's decision to enter a plea. Thus his *understanding*, rather than the actual law, was all that mattered.

on cross-examination, the defense joined issue on these matters.

So there was evidence that Mr. Benson entered a plea to the charge of stalking minor girls. A permissible inference was that he did indeed stalk minor girls. The plaintiffs had relied in part on Mr. Benson's opinions based on his training and "morals." For the defense to refer to Mr. Benson in closing as a man who stalks little girls was unnecessary and probably got the defense nowhere with the jury—but it was not improper under these circumstances.

In sum, the plaintiffs lodged only two objections to the portions of the defense opening and closing they now say were improper. The objections were unfounded. And in any event, it is unlikely that the verdict was significantly impacted by either the comments to which the plaintiffs objected or the other portions of the opening and closing about which the plaintiffs now complain.

The plaintiffs never asked for a curative instruction or mistrial. Having raised no objection and having chanced to hear the verdict, the plaintiffs ought not be heard now to complain. *See, e.g., Oxford Furniture Co., Inc. v. Drexel Heritage Furnishings, Inc.*, 984 F.2d 1118, 1128 (11th Cir. 1993) ("Requiring timely objection [to improper closing argument] prohibits counsel from 'sandbagging' the court by remaining silent and then, if the result is unsatisfactory, claiming error").

IV

The plaintiffs lost this case not because of the defense opening statement or

closing argument but because the manifest weight of the evidence entitled the defendant to prevail.  The plaintiffs' assertion that the opening and closing entitle them to a new trial comes too late and in any event is unfounded on the merits.  Accordingly,

    IT IS ORDERED:

    The plaintiffs' motion for a new trial (document 278) is DENIED.

    SO ORDERED on August 29, 2008.

                                       s/Robert L. Hinkle
                                       Chief United States District Judge